## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JOSEPH INTURRI, ET AL.   :  CIVIL ACTION NO. 3:03CV987 (CFD)
  Plaintiffs

vs.          :

CITY OF HARTFORD, CONNECTICUT;
and BRUCE P. MARQUIS,
  Defendants     :  MAY 21, 2004

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the plaintiffs move for summary judgment on their complaint as there are no genuine issues of material fact to contradict that the defendants issued an order which is unconstitutionally vague in violation of the fourteenth amendment to the United States Constitution, and which singled out plaintiffs in violation of the Equal Protection Clause under the fourteenth amendment to the United States Constitution.  The plaintiffs, therefore, are entitled to judgment as a matter of law.  For those reasons, the plaintiffs' motion must be granted.

## HISTORY OF CASE

On June 4, 2003, the plaintiffs, five sworn police officers with the Hartford Police Department who have visible tattoos, brought this action seeking injunctive and monetary relief under 42 U.S.C. §§ 1983 and 1988, against the City of Hartford and the Chief of Police, Bruce P. Marquis.  This action relates to the issuance and enforcement of General Order 6-15, a departmental dress code policy containing a section, entitled "Tattoos", which authorizes the Chief of Police to issue orders and discipline based on whether a tattoo is "offensive and/or...unprofessional".  Plaintiffs were identified as violating said provision, and, as a result were subjected to certain orders and negative treatment.  Based on the issuance and enforcement

-1-

of General Order 6-15, plaintiffs claim that defendants violated their due process rights and the Equal Protection Clause pursuant to the fourteenth amendment to the United States Constitution.

## SUMMARY OF FACTS

The plaintiffs are sworn police officers for the City of Hartford. The plaintiffs, Joseph Inturri, Stephen Miele and Matthew Rooney, who have been police officers with the City of Hartford since 1983, 1987 and 1988, respectively, have had visible spider web tattoos on their arms for years. Plaintiffs Darren Besse and Mark Castagna, who have been police officers with the City of Hartford since 1990 and 1987, respectively, have spider web tattoos on their respective arms since March 2003. See, Affidavits of plaintiffs and attached photographs. The defendant, City of Hartford, is a municipal corporation organized pursuant to the laws of the State of Connecticut. The defendant, Bruce P. Marquis, was the Chief of Police for the City of Hartford from December 2000 to January 2004, and was the ultimate policy maker for Hartford police matters. Since at least 1985, a version of Hartford Police Department General Order 6-15 has provided standards and requirements for police uniforms and appearance.

In 1997, General Order 6-15 was revised to address, inter alia, tattoos. Section III C.5, states, Tattoos that are visible to the public and deemed offensive, immoral, or presenting an unprofessional appearance, as deemed by a supervisor, shall require the officer to cover said tattoo with a bandaging type material or a long sleeve shirt in accordance with the Uniform of the Day Standards.

In 1999, General Order 6-15 was revised again. Section III C.5 was amended to read Tattoos that are visible to the public and deemed offensive, immoral, or presenting an unprofessional appearance, as deemed by the Chief of Police, shall require the officer to cover said tattoo with a bandaging type material or a long sleeve shirt in accordance with the Uniform of the day Standards.

-2-

On or about October 17, 2002, Detective Keith Knight, of the Hartford Police Department wrote a letter to Michael Wood, the President of the Hartford Police Union, raising several personal concerns. He provided copies of this letter to City of Hartford officials, including the police chief, the mayor, deputy mayor, city manager and council members.

The four-page October 17, 2002 letter from Knight, devotes the following lines to the issue of tattoos worn by Hartford police officers: Let s debate the issue of a white police supervisor along with two other white police officers wearing a racist tattoo of a white supremacy group called the Aryan Nation. The tattoo which is a spider web tattoo, which I am informed by the Department of Correction who [sic] monitors such groups that the tattoo symbolizes race hatred of non-whites and Jews. I know the U.S. Constitution gives everybody the right to free speech and expression, but this is unacceptable for a police officer to wear in plain view knowing that it offends and what it stands for. Where is the enthusiastic debate on this issue?

Following receipt of a copy of the October 17, 2002 letter, City Manager Lee Erdmann informed defendant Marquis that the issue of spider web tattoos was a concern of the mayor and at least some city council members and asked him to bring it to resolution. Chief Marquis consulted with the Office of the Corporation Counsel and also sought the opinion of a contact at the Federal Bureau of Investigation. The defendants also reviewed the Anti-Defamation League (ADL) web-site s write up on spider web tattoos. The ADL describes spider web tattoos as, ..often found on arms or under arms of racists who have spent time in jail. In some places, one apparently earns this tattoo by killing a minority. However, non-extremists may sometimes sport this tattoo as well, unaware of its other symbology, simply because they like the design .

On April 14, 2003, Bruce P. Marquis revised Section III.C.5 of General Order 6-15 as follows: The Chief of Police has the authority to order personnel to cover tattoos that are

deemed as offensive and/or presenting an unprofessional appearance. Personnel shall cover the tattoo with either a flesh tone, navy blue or white type material that matches the uniform shirt or wear a long sleeve shirt in accordance with the Winter Uniform of the Day Standard.

On or about April 14, 2003, Bruce P. Marquis issued a memorandum to all sworn personnel to cover all visible spider web tattoos while on-duty or while wearing a Hartford Police Uniform as  [i]t has been determined that [said tattoo] is offensive.    This is the only type of tattoo that was ordered covered.

Following the issuance of the April 14, 2003 memorandum, the plaintiffs, all of whom sport visible spider web tattoos, have complied with the order to cover them while in an on-duty capacity or wearing the Hartford Police Uniform.  Many other officers within the department sport tattoos, that are visible while in uniform.  None have been told to cover them.  Plaintiffs, also, have other types of tattoos that they are not required to cover.

At all relevant times, there was a collective bargaining agreement in effect between the City of Hartford and the Hartford Police Union, of which plaintiffs were and are members. Such collective bargaining agreement provides that discipline shall be meted out for just cause. Plaintiffs have not been disciplined in any manner and have not lost any pay as a result of the issuance of the April 14, 2003 memorandum. The April 14, 2003 memorandum was issued pursuant to official policy.  In issuing the April 14, 2003 memorandum, Bruce P. Marquis was acting as a final policy maker for the City of Hartford.

On or about June 5, 2003, Elizabeth Horton Scheff, the City of Hartford Council Majority Leader, was accurately quoted in the newspaper saying:   It [tattoo] could be a picture of a dog chasing a cat and [if] it was offensive, it should be covered.

 None of the plaintiffs sport their tattoos as a symbol of any racist or anti-Semitic philosophy or statement.

## I.      STANDARD FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if   the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.   *Millgard Corp. v. White Oak Corp.,* 224 F. Supp. 2d 425, 428 (D. Conn. 2002), *citing Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir. 1992).

The moving party bears the initial burden of demonstrating that no factual issue exists and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). In this case, the parties have stipulated to all material facts.  Therefore the only issues are questions of law.

## II.      THE PLAINTIFFS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW

There is no dispute that each of the plaintiffs sports a visible spider web tattoo on at least one arm and, that the defendants, pursuant to a policy referencing its right to determine whether any visible tattoos are,   deemed as offensive and/or presenting an unprofessional appearance , have determined that the plaintiffs must cover said tattoos while the plaintiffs are on duty or are in uniform.  No other officers with tattoos have been told to cover their tattoos, and the plaintiffs have not been told to cover any other tattoos.  The legal issues for this Court are:

1.  Whether Section III.C.5 of the revised General Order 6-5 is unconstitutionally vague on its face and as applied to these plaintiffs in violation of 42 U.S.C. §§ 1983 and 1988, and the fourteenth amendment to the United States Constitution; and

2.   Whether defendants  application of Section III.C.5 of the revised General Order 6-5 deprives the plaintiffs of their federal constitutional rights, in violation of 42 U.S.C. §§ 1983 and 1988, by arbitrarily or capriciously singling them out for different treatment, in violation of the Equal Protection Clause of the fourteenth amendment to the United States Constitution.

As such questions of law should be answered in the affirmative, this Court is requested to grant the plaintiffs motion for summary judgment.

## ARGUMENT

**III.    THE GENERAL ORDER VIOLATES THE PLAINTIFFS RIGHTS BECAUSE IT IS UNCONSTITUTIONALLY VAGUE**

Section III.C.5 of revised General Order 6-15 is unconstitutionally vague on its face and as applied to these plaintiffs by providing unbridled discretion, with no standards of definition or application guiding that discretion, to the defendants, to impose arbitrary discipline on the plaintiffs, on an *ad hoc* basis, up to and including termination, and does not give the plaintiffs adequate notice that they will be subject to disciplinary action for such conduct. Furthermore, the Order fails to provide fair notice to the plaintiffs, most of whom have had their tattoos for years, what designs are prohibited.

Tattoos are defined as an indelible mark or figure fixed upon the surface of the body by the insertion of pigment under the skin or by the production of scars . Webster s Third New International Dictionary, (1986), p. 2344. America s core cultural reference books, professional journals, newspapers and magazines recognize tattooing as a well established art form that, over the last decades, has undergone dramatic changes. *Commonwealth of Massachusetts v. Meuse*, Superior Court, at Essex, 10 Mass. L. Rep.661; 199 Mass. Super LEXIS 470 (1999 Mass. Super.) (attached hereto). Tattooing is recognized by governmental agencies as an art form, a profession, often regulated, and tattoo-related art work is the subject of museum, gallery and educational institution art shows across the United States. *Id*. at 666-67.

Defendants claim plaintiffs tattoos are racist symbols, without a hearing, without notice, and without any way to challenge the improper analysis and inaccurate conclusion. The Plaintiffs have been told they must cover their arms by dressing in unseasonable uniforms or wearing cloth bandages, or face discipline.

The section of the General Order directly at issue authorizes the Chief of Police to order

personnel to cover tattoos that are deemed as offensive and/or presenting an unprofessional appearance . Over the years, the section has been modified slightly, most notably in the omission of the word, immoral, as one of the determining adjectives, and in the deletion of any reference as to who makes the determination of whether a tattoo is in violation thereof. Many of the officers of the Department, including Plaintiffs, have visible tattoos. It is solely the spider web that has been singled out as offensive under this policy. The backdrop to this determination relates to a letter from a disgruntled African American detective to the president of the Hartford Police Union, raising a host of issues of concern, which also refers to the spider web tattoos as, racist and connected with white supremacy , while conveying, hatred of non-whites and Jews . Defendants concede that the Anti- Defamation League itself recognizes that the spider web tattoo is a design which many people sport unaware of its other symbology or simply because they like the design . There is no evidence that defendants have conducted any objective research, review or study of any tattoo design sported by any officers, including this one.

Defendants are not enforcing a policy that would require plaintiffs to act in uniformity with other officers. Instead, they are singling plaintiffs out by requiring them to dress differently, i.e., by wearing winter uniforms in the summer, or by wearing cloth bandages covering their arms. Plaintiffs have complied with said order to date to avoid discipline, despite the fact that their appearance suggests to other officers and/or citizens that the covered tattoos reveal racist beliefs or sympathies. The plaintiffs appearance is noticeably different from other officers, especially in the warmer months, when the dress code either permits or requires officers to wear short-sleeved shirts.

Section I of the Fourteenth Amendment provides, in pertinent part, that [n]o State shall .... deprive any person of life, liberty or property, without due process of law. The defendants order violates the "basic principle" inherent in the notion of due process that "an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford,* 408

U.S. 104, 108 (1972).

The vagueness doctrine is based on "notions of fair notice or warning." *Smith v. Goguen*, 415 U.S. 566, 572 (1974).   The purported vagueness must be such that the statute is incapable of giv[ing] the person of ordinary intelligence a reasonable opportunity to know what is prohibited   by failing to provide  explicit standards   ensuring that it is not arbitrarily enforced. *Grayned v. City of Rockford*, [supra].  *Dormi v. Satti*, 862 F.2d 432 (2nd Cir. 1988).

The void-for-vagueness doctrine requires that an enactment define its terms   with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)." *United States v. Amer*, 110 F.3d 873 (2nd Cir. 1997). The Constitution is designed to maximize individual freedoms within a framework of ordered liberty.  *Kolender, supra,* at 356. There must be minimal guidelines within the enactment to provide guidelines for enforcement.  Lacking such guidelines, the enactments may permit a   standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.  *Id.* quoting *Smith, supra*, 415 U.S. at 575. "Regulations are unconstitutionally vague `only when [they] expose[] a potential actor to some risk or detriment without giving him fair warning of the nature of the proscribed conduct.' *Rowan v. United States Post Office Department*, 397 U.S. 728, 740, 90 S. Ct. 1484 (1970)." *United States v. Hescorp, Heavy Equipment Sales Corp.,* 801 F.2d 70 (2nd Cir.1986).

In *Grayned*, the Supreme Court specified the values protected by the prohibition against vague laws:

> First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

*Id*. at 108-09 (internal footnotes omitted).

The Supreme Court has further emphasized that these standards should not be "mechanically applied." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498 (1982). "The degree of vagueness that the Constitution tolerates -- as well as the relative importance of fair notice and fair enforcement -- depends in part on the nature of the enactment." *Id*. "[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Id.* at 499

General Order 6-15 directly impacts a liberty interest of individuals protected by the Fourteenth Amendment, as it involves matters of personal appearance. *See*, *East Hartford Education Association v. Board Of Education of the Town of East Hartford,* 562 F.2d 838, 842 (2d Cir. 1977) ( liberty interest implicated by teacher s challenge to school dress code); *Stephenson v. Davenport Community School District,* 110 F3d.1303, 1307 (8th Cir. 1997)(school district s regulation banning the display of gang symbols implicated plaintiff s liberty interests governing her personal appearance); *Rathert v. Village of Peotone*, 903 F 2d 510, 514 (7th Cir. 1990) (choice of appearance is an element of liberty); *DeWeese v. Town of Palm Beach*, 812 F.2d 1365, 1367 (11thCir. 1987) (liberty interest in choice of dress is constitutionally protected, as is right of citizen to choose mode of personal hair grooming); *Domico v. Rapides Parish School Bd.*, 675 F.2d 100, 101 (5th Cir. 1982) (constitutional liberty interest in choosing how to wear one s hair); *Lesser v. Neosho County Comm. College*, 741 F. Supp. 854, 861 (D.Kan. 1990) (college students have generally recognized liberty interest in control of own personal appearance).[1]

---

[1]  The plaintiffs concede that public employers have the right to limit this liberty interest in one s personal appearance while at the work place. However, this does not alter the

The Order is void for vagueness on its face, because it provides unbridled discretion to the defendants to determine whether a particular tattoo is, offensive and/or... unprofessional , undefined terms, within the subjective determination of some unnamed or unidentified person or entity; and, because it violates due process, as applied to the facts of his case, as it fails to provide notice that it even applies to the plaintiffs tattoos. In order for the defendants subjectively-based Order to survive judicial scrutiny, given that the provision contains no standards for determining whether any tattoo is in violation, and as such, vests virtually complete discretion in the chief, or some unnamed person it must be adequately defined. In the absence of defined terms, the potential for arbitrary action is a real concern, *Kolender, supra*, at 358, (cite omitted).

In this case, the tattoo provision at issue has existed for years, in slightly different form, during which time most of the plaintiffs readily and openly sported their web tattoos. Plaintiffs were never informed that they were in violation of the General Order until April 2003, when the tattoos suddenly were, deemed as offensive by someone, such that plaintiffs were ordered by defendant Marquis to cover their arms. The only precipitating complaint or incident brought to the attention of plaintiffs is the letter from one detective in the department .[2] Plaintiffs have not been questioned about these or any other tattoos, nor have they been informed as to how the decision was reached concerning the violation. The passive verbiage of the provision suggests that it is not necessarily the opinion of the Chief that is determinative. It is the Chief who can order the tattoos covered, but only when a tattoo is, *deemed as* offensive and/or... unprofessional , which begs the question, deemed by whom? . City Counsel Majority Leader Elizabeth Horton-Scheff aptly but inadvertently highlighted the dilemma presented by the vague order, when she publicly declared, [i]t could be a picture of a dog chasing a cat and [if] it was

---

analysis requiring that such codes or rules be clear and applied uniformly.

[2]    Detective Knight s letter was not addressed to the defendants or other officials. However, copies were sent to a number of city officers and employees.

offensive, it should be covered . This statement clearly illustrates the utter arbitrariness of the order and its scope. Any tattoo, any design, regardless of when obtained, regardless of the inherent neutrality of the image or of its meaning, to the person who sports it, can be the subject of arbitrary enforcement and disciplinary action without notice.

That the provision is facially vague is clear. That the provision is vague as applied to plaintiffs is equally plain. General Order 6-15 has never been construed by any court nor applied to anyone except plaintiffs. The plaintiffs have had the tattoos, in some cases, for years, during which they were never considered to be in violation of the provision. Plaintiffs had no notice or warning that the provision might be applied to them. The facts in this case establish that the provision allows arbitrary enforcement, changing definitions and standards with whims and tastes.[3]

In *Hodge v. Lynd*, 88 F. Supp. 2d. 1234 (D. N. Mex, 2000), the court overturned a dress code issued by a county fair instructing the Sheriff s Department to enforce a zero tolerance for gang activity and inappropriate behavior. The Sheriff s Department received information that wearing baseball hats backward could be a gang symbol. Plaintiff, who was wearing a baseball cap backward, was removed from the fair, and when he later entered again, was arrested for trespass. He brought an action claiming, inter alia, that the county dress code banning gang-related apparel was unconstitutionally vague. The district court found that, due to the lack of specificity in defining what clothing was banned, enforcement of the dress code is left to the unfettered discretion of the officers. *Id*. at 1245. It ultimately concluded that the provision was void for vagueness.

In *City of Chicago v Morales*, 527 U.S. 41 (1999), the court held that a city ordinance forbidding loitering was unconstitutionally vague. The court determined that lack of clarity in

---

[3]  The very definition of a tattoo is that it is indelible and permanent As such, today s neutral design of a heart with the phrase I Love Mom could be tomorrow s offensive slogan du jour.

the description of the loiterer s duty to obey a dispersal order might not render the ordinance unconstitutionally vague if the definition of the forbidden conduct were clear, but it does buttress our conclusion that the entire ordinance fails to give. . . notice of what is forbidden and what is permitted.    The *Morales* court added that  the ordinance was vague  not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.  *Id.* at 59-60, quoting *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971).   For years, a visible spider web tattoo was a neutral, meaningless design; one day it offends someone and becomes a violation of an order. The provision sets no standards for determining, as to any officer, whether any particular tattoo is in violation of the policy.  One day a spider web violates a departmental of policy.  Another day, a dog chasing a cat is deemed  offensive.   Another day, it could be a Star of David or a Muslim half moon.  The plaintiffs assert that anything at all can be  offensive  to someone.

In *Stephenson v. Davenport Community School District*, *supra*, the court reviewed the propriety of a high school prohibition against  gang related activities, such as displays of  colors . . .  symbols, signals, etc. . .   against a claim of vagueness under the Fourteenth Amendment.  Students in violation thereof were subject to suspension and/or expulsion. Stephenson had a tattoo of a cross on her hand which was deemed by school officials to be prohibited by the policy, although there was no other evidence that she was involved with a gang. She had the tattoo surgically removed in order to graduate and to avoid suspension or expulsion. In determining whether the school ordinance was constitutionally vague, the court looked to definitions of the words employed therein, relying on historical and social writings, the dictionary and case law.  The court found the term  gang  to be  notoriously imprecise  and the meaning of,  gang activity  to be as varied as those attempting to define it. *Id*. at 1309 (cites omitted).  The school ordinance was found to be fatally vague because it permitted unfettered discretion to school officials in deciding what violated the policy and lacked any  narrowly drawn, reasonable and definite standards for identifying the expression  that the school district sought to restrict.

*Id.* at 1310.

In this case, defendants order can be reviewed, for definitiveness, as in *Stephenson*, by looking for definitions of its terms. Webster s Third New International Unabridged Dictionary, (1986), p. 1566, defines offensive as causing displeasure or resentment ; The term unprofessional is defined, as not characteristic of or befitting a member of a profession. *Id.* at 2506. Black s Law Dictionary, 7th Edition, (1999), p. 1110, defines offensive as causing anger, displeasure or resentment. The word unprofessional is not defined therein, but professional is defined, as [a] person whose occupation requires a high level of training and proficiency *Id.* at 1226. While the dictionary definitions of offensive are highly subjective, relating to emotional reactions, the definitions of unprofessional are completely tautological, relating to the standards of the profession itself. Thus, reliance on dictionary terms does not help clarify the meaning of the order.

Indeed, the Connecticut Supreme Court, in considering the term offensive conduct in connection with the disorderly conduct statute (Conn. Gen. Stat. § 53a-182), held, in *State v. Indrisano*, 228 Conn. 795, 640 A.2d 986 (1994), that the term was inherently facially vague. In reaching this conclusion that court rejected a definition proffered earlier by the Connecticut Appellate Court in *State v. Lo Sacco*, 12 Conn. App. 481, 488-89, 531 A.2d 184, cert denied, 205 Conn. 814, 533 A.2d 568 (1987), that defined offensive conduct as conduct which under contemporary community standards is so grossly offensive to a person who actually . . . sees it as to amount to a nuisance. *Indrisano, supra*, 228 Conn. 816-17 n. 10.[4] Instead, the Connecticut Supreme Court adopted a definition drawing on obscenity law, defining the phrase offensive to mean conduct that is grossly offensive, under contemporary community standards, to a person

---

[4] Relying on *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971), the Connecticut Supreme Court held that the phrase offensive or disorderly conduct is equally facially vague in the absence of some authoritative gloss that would have rendered it more specific. Conduct that is offensive to or would be considered disorderly by some people would not be so considered by others. *Indrisano, supra*, 228 Conn. at 816-17. This is precisely the point raised herein by the plaintiffs.

who actually overhears it or sees it.  *Id*. at 818.

Clearly, neither dictionary definitions, nor judicial opinions, assist in the present case to narrow the application of General Order 6-15.  The Order does not permit the average officer, including plaintiffs, to predict or know what is prohibited. The Order s wording requires subjective interpretation.  As in *Stephenson,* where a cross was the symbol the defendants targeted, the spider web design has many meanings.  To the uninitiated, it could conjure images of insects; to others, it could invoke a popular and contemporary comic book (and feature film) hero, *Spiderman;* to another it may reference a children s book, *Charlotte s Web.*  A popular African-American model, Tyson Beckford, who is known for print advertising for Ralph Lauren, a fashion designer specializing in high end clothing, sports this same tattoo. *See,* www.askmen.com.   As the ADL website states, some  sport this tattoo...unaware of its other symbology, simply because they like the design.

Even if the order were not impermissibly vague on its face and in all of its applications, the plaintiffs can still prevail by showing that the law is impermissibly vague as applied to them. The plaintiffs contend that they could  not have foreseen that the order would apply to their tattoos, and/or that they are the victims of arbitrary enforcement practices. See, e.g., *Rowan v. United States Post Office Dep't,* 397 U.S. 728, 740 (1970) (a statute is fatally vague "when it exposes a potential actor to some risk or detriment without giving him fair warning of the nature of the proscribed conduct"); *United States v. Freeman,* 808  F.2d 1290, (8th Cir. 1987*); cert. denied,* 480 U.S. 922 (1987).

"Due process requires that all 'be informed as to what the State commands or forbids,' and that 'men of common intelligence' not be forced to guess at the meaning of the criminal law." *Smith, 415 U.S. at 574* (quoting *Lanzetta v. New Jersey,* 306 U.S. 451, 453 (1939*)* and *Connally v. General Construction Co.,* 269 U.S. 385, 391 (1926)). Given the inherent vagueness of the Order, due process demands that the conduct proscribed therein be clearly defined.  The notion as

-14-

set forth in the  purpose  and  policy  sections of the Order, that police officers should have

uniform appearances and look  professional , are laudable objectives.  However, the fact that the

terms  offensive and/or . . . unprofessional  might be clear in some circumstances, and could be

used to require across-the-board uniformity, does not justify the arbitrary and subjective

application of such a rule in these circumstances.

A majority of the plaintiffs herein sported these tattoos for years, without incident, while a

similar, if not identical, General Order was in place.  They were not told that the tattoos were in

violation of policy until April 2003.  Plaintiffs were informed that they were in violation of the

policy after a letter from a disgruntled member of the police force made its way to City Hall.

Plaintiffs are entitled to the relief they seek herein because they were not provided fair warning of

the conduct that is proscribed and future application of the order would violate the dictates of

constitutional due process.

## IV.    DEFENDANTS  ORDER VIOLATES PLAINTIFFS  EQUAL PROTECTION CLAUSE UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

The Equal Protection Clause of the United States Constitution provides that no state shall

"deny any person within its jurisdiction the equal protection of the laws." United States

Constitution amendment XIV, §1.  It "is essentially a direction that all persons similarly situated

should be treated alike." *Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439 (1985).

To establish a violation under the Equal Protection Clause, the plaintiffs must show that they

are otherwise similarly situated to other officers with visible tattoos on their bodies, and must

demonstrate that they were treated differently and arbitrarily.  *See, McNabola v. Chicago Transit*

*Authority,* 10 F.3d at 501, 513 (7th Cir.1993). Plaintiffs are members of the City of Hartford

Police Department who, like many other officers within the department, sport tattoos.  Plaintiffs

have been singled out and treated differently than other officers due to having spider web design

tattoos that someone deemed  offensive.    The plaintiffs are forced to wear distinctive and

visible cloth armbands or winter uniforms with long sleeves and pants during the summer heat.

Before determining the validity of the Order invoked to justify the different treatment of plaintiffs, the Equal Protection Clause requires the Court first decide the proper standard of review. If the classification is based on the "suspect" classifications of race, alienage, or national origin, or if a fundamental right is involved, the classification will be subjected to strict scrutiny and will only be upheld if the law is tailored to serve a compelling state interest. *See, Cleburne, supra* at 440. If the classification is based on a "quasi-suspect" classification such as gender, the classification "fails unless it is substantially related to a sufficiently important governmental interest." *Id.* at 440-41. A third type of analysis is called rational basis review which requires that the law be rationally related to a legitimate governmental interest. *See, Allied Stores of Ohio, Inc. v. Bowers,* 358 U.S. 522, 528-29(1959), *Burke Mountain Acad., Inc. v United States.* 715 F.2d 799, 783 (2d Cir. 1983). A law will survive this level of scrutiny unless the plaintiff proves that the law s class-based distinctions are wholly irrational. *See,* e.g., *Hodel v. Indiana*, 452 U.S. 314, 331-32(1981). The Plaintiffs do not claim that strict scrutiny applies here. They do, however, claim that intermediate scrutiny is appropriate in this case. In any event, plaintiffs claim the defendants actions will not even survive rational basis review.

There is an intermediate level of scrutiny that lies between [the] extremes of rational basis review and strict scrutiny . Intermediate scrutiny is typically used to review laws that employ quasi-suspect classifications, such as gender, or legitimacy. On occasion, intermediate scrutiny has been applied to a law that affects an important, though not constitutional, right . *Ramos v. Town of Vernon*, 353 F.3d 171,175 (2d Cir. 2003), rehearing, en banc, denied, 2004 U.S. App. LEXIS 938 (2d Cir. 2004),(cites omitted). Under this level of review, the government must show that the enactment being challenged is substantially related to an important governmental interest. *Id.*

Plaintiffs tattoos are permanent and indelible parts of their personal appearance, and invoke their liberty interest. *See, Stephenson*, *supra.* While one s rights in his personal appearance may not rise to the level of a fundamental constitutional right, it is an important liberty interest, and,

thus, warrants review under the intermediate scrutiny standard . In order to survive a constitutional challenge under intermediate review, the party seeking to uphold the challenged ordinance has the burden of showing that it is related to an important governmental interest and that there is exceedingly persuasive justification for the classification . *Mississippi Univ. for Woman v. Hogan*, 458 U.S. 718, 724 (1982). The purpose of requiring a substantial relationship to an important governmental interest is to assure that the validity of a classification is determined through reasoned analysis rather than through mechanical application of traditional, often inaccurate assumptions. *Id.* at 725-26. The burden of justification is demanding and rests entirely on the [defendants] . *United States v. Virginia*, 518 U. S. 515, 533 (1996). In applying this standard, the Supreme Court has demanded that the government provide persuasive empirical support to demonstrate the validity of assumptions underlying the discrimination at issue. *See*, e.g., *Wengler v. Druggists Mutual Ins. Co.*, 446 U.S. 142, 151-52 (1980); *Craig v. Boren*, 429 U.S.190, 200-04 (1976).

Utilizing intermediate scrutiny, the defendants here must establish that the interpretation and implementation of a policy authorizing differentiation between police officers based on specific tattoo design is related to an important governmental interest and that the disparate treatment of plaintiffs is substantially related thereto. Defendants have the burden of showing persuasive empirical data that an order targeting web tattoos serves an important governmental interest and then must demonstrate the validity of assumptions underlying the discrimination against plaintiffs based on the particular spider web designs. Defendants cannot meet this heavy burden. They have never claimed to have conducted an analysis between their objectives and the order, nor between their objectives and the treatment of plaintiffs. They have apparently deferred, in a knee-jerk response, to the opinion of one detective who claimed to be offended by the design, and also a website that mentions that some racist groups have adopted the spider web design as a symbol of their beliefs.

If this court were, in the alternative, to determine that personal appearance was a quasi-

suspect class subject to rational basis analysis, then defendants must still show that the chief s directive is rationally related to a legitimate government interest, and does not impose an irrational burden on individuals.  If the end is legitimate and not prohibited by the Constitution, but the means are inappropriate and/or not adapted to that end, then the policy is unconstitutional.  *Zalewska v County of Sullivan*, 316 F.3d 314 (2d Cir.2002).

Defendants, likewise, cannot meet the rational basis test.  Under this test, Defendants must establish that distinguishing between different tattoo designs on police officers serves a legitimate governmental interest, and that discriminating against plaintiffs due to the spider web design is plainly adapted to that end.  Therefore, defendants must show that requiring plaintiffs to wear armbands that suggest that they are racists, or forcing them to wear winter uniforms in summer heat, is not an irrational burden.

The Hartford Police Department Order has the stated purpose,  [t]o establish policy and procedure for the wearing of the Hartford Police Department uniform and appearance standards .  The policy goes on to state that,  [t]he policy uniform identifies members of the Hartford Police Department and makes them readily recognizable to citizens.  The uniform shall reflect a positive image on behalf of the Department and members shall present a professional appearance to the public at all times by maintaining themselves and their uniforms in a neat and clean condition.  Plaintiffs do not challenge this goal, but note that the application of the order to them is plainly unreasonable.

In analyzing the constitutionality of a hair style restriction in a police department, the Supreme Court in *Kelley, supra,* recognized a police department s prerogative to make officers readily identifiable to the public and to encourage the *esprit de corps* within the department.  The *Kelley* court found either grounds a sufficiently rational justification to defeat a liberty interest claim under the Fourteenth Amendment.  *Id*.  However, while the plaintiff in *Kelley* was challenging a police department requirement to conform his hair length with uniform dress code provisions, the Defendants  interpretation of the General Order here seeks to *distinguish* between

-18-

similarly-situated officers in an arbitrary way.    In the instant case, the plaintiffs were singled out and identified as different from other officers; while plaintiffs are seeking to be treated the same as their fellow officers who also sport visible tattoos. The defendants  stated policy purpose is to make all officers appear  uniform , such that they are readily identifiable to the public.  To the contrary, Defendants  actions have served only to isolate the plaintiffs and require them to appear different than the other officers in the department.  This, in turn, will undoubtedly subject the plaintiffs to hostility and embarrassment.  The defendants have not encouraged *esprit de corps*, by their actions.  Rather, they have sown the seeds of dissension and loss of morale.

In *Riggs v. City of Forth Worth*, 229 F. Supp. 2d 572 (N.D. Tex. 2002), the district court examined a  claim by a police officer who alleged an equal protection violation because he was treated differently due to his visible tattoos.  *Riggs*, which appears to be the only reported case involving a prohibition of visible tattoos on a police officer, is readily distinguishable from the case before this Court, because the dress code provision being challenged did not mention tattoos; it indicated that,  police personnel in the department shall wear such uniform and insignia as the Chief of Police prescribes .  *Id.* at 577.  The plaintiff, while one of 15 officers in the department with tattoos, was the only officer with tattoos covering his arms and legs. *Id.* at 582.   He alleged discrimination due to his being singled out to wear long sleeves and long pants, and being transferred out of the  bike unit  (where short sleeves and short pants was the standard uniform). The defendant city claimed that they required the plaintiff, alone, to wear long sleeves and long pants, to  insure a professional uniform appearance to the public of uniformed Fort Worth officers , because he was the only officer with visible leg and arm tattoos.  *Id.*  The court held in favor of the defendant city, holding that the chief,  had legitimate, non-discriminatory reasons for requiring the only officer in the Fort Worth Police Department who has tattoos covering his legs and arms . . . to wear a uniform that is not required of other police officers .  *Id.* at 581-82   In the instant case, Plaintiffs are only five of the admittedly several officers within the department with tattoos plainly visible while in uniform.  Plaintiffs have *not* been singled out

simply because they have visible tattoos.  Rather, they have been singled out due to the specific design of the tattoo and a misperception of the design s meaning.

Defendants have claimed a number of factors informed their decision to ban the Plaintiffs specific tattoos design, including a federal consent decree  arising from a settlement in *Cintron v. Vaughan,* civil action number 13,578, a case from 1969 that has nothing to do with the plaintiffs tattoos. The consent decree, however, talks about the Hartford Police officers agreeing to be  courteous, civil, and respectful  to one another, and to refrain from  harsh, violent, coarse, profane, sarcastic or insolent language  .[4]  Other considerations claimed by defendants in support of their actions include the ADL website, the minority population of the city,  race relations , and demographics of the employees in the police department.  The defendants  reason for targeting plaintiffs is basedup on one person s statement, that the tattoos have a negative racial or anti-Semitic implication.  The rationale provided does not address the arbitrary manner in which plaintiffs were singled out for different treatment from other officers.  It does not provide an objective analysis of tattoos, overall, in the department.  The defendants do not even attempt to argue that the objection raised by the one detective was rational.  The defendants conclude that plaintiffs  tattoos were  offensive  solely because one person thought it was.  This assertion serves to illustrate defendants  lack of rationality in reaching the determination relative to tattoos, generally, and plaintiffs, specifically.

Plaintiffs concede that the defendants may have an important interest in developing and maintaining a uniform dress code for police officers, and that plaintiffs  liberty interest in personal appearance might give way to an important governmental interest.  However, plaintiffs contend that defendants have no important governmental interest in distinguishing between tattoos on different officers, based upon design, content, artistic quality or other arbitrary

---

[4]Notably, none of the plaintiffs were police officers in 1969, and the application of the consent decree has never been maintained as a justification to distinguish between tattoos in the interim 35 years, until now.

distinction.  Defendants cannot justify segregating plaintiffs and allowing others to brand them as racists, which ultimately destroys the departmental *esprit de corps*.

Because the Defendants' action is not rationally related to a legitimate governmental interest and places an irrational burden on the Plaintiffs, it does not have a rational basis, and remains, therefore, an unconstitutional violation of equal protection of the law.

## CONCLUSION

For the foregoing reasons, because there is no genuine issue of material fact, the Plaintiffs request that the Court grant their motion for summary judgment because General Order 6-15 is either unconstitutionally vague and/or because its application to the Plaintiffs violates the Equal Protection Clause of the United States Constitution.

THE PLAINTIFFS,

By:    _____
　　　　Jon L. Schoenhorn
　　　　Schoenhorn & Associates
　　　　His Attorneys
　　　　97 Oak Street
　　　　Hartford, CT 06106
　　　　Tel. (860) 278-3500
　　　　Fax (860) 278-6393
　　　　Fed. Bar No. ct00119

## CERTIFICATION

This is to certify that a copy of the foregoing was mailed, first-class postage prepaid, on this 21st day of May, 2004, to the following:

Helen Apostolidis, Esq
City of Hartford Corporation Counsel
550 Main Street
Hartford, CT 06103

_____
Jon L. Schoenhorn