## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOSEPH INTURRI, ET AL., | : | |
|     Plaintiffs, | : | |
| | : | |
|     v. | : | Civil Action No. |
| | : | 3:03 CV 987 (CFD) |
| CITY OF HARTFORD, CONNECTICUT | : | |
| and BRUCE P. MARQUIS, | : | |
|     Defendants. | : | |

### RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

The plaintiffs, five police officers for the City of Hartford, brought this action against the City and Bruce P. Marquis, the Chief of the Hartford police department,[1] challenging the portion of the department's uniform and appearance regulations which provides that "[t]he Chief of Police has the authority to order personnel to cover tattoos that are deemed offensive and/or presenting an unprofessional appearance," as well as Chief Marquis' order requiring the plaintiffs to cover certain tattoos. The parties have moved for summary judgment as to all counts of the complaint. For the following reasons, the plaintiffs' motion for summary judgment **[Doc. # 19]** is **DENIED** and the defendants' motion for summary judgment **[Doc. # 18]** is **GRANTED**.

## I    <u>Facts</u>

The parties have stipulated to the following facts: The plaintiffs, Joseph Inturri, Stephen Miele, Matthew Rooney, Darren Besse and Mark Castagna, are police officers for the City of Hartford, and have tattoos on their arms depicting a spider web. Since at least 1985, the police department's General Order 6-15 has provided the standards and requirements for the uniforms

---

[1]The complaint names Chief Marquis in both his official and personal capacities. Although Chief Marquis has since resigned, he remains a defendant in this action.

and appearance of all officers.  In 1997, General Order 6-15 was revised to specifically address tattoos, providing in Section III.C.5 that: "Tattoos that are visible to the public and deemed offensive, immoral, or presenting an unprofessional appearance, as deemed by a supervisor, shall require the officer to cover said tattoo with a bandaging type material or a long sleeve shirt in accordance with the Uniform of the Day Standards."  In 1999, Section III.C.5 was revised once again, providing: "Tattoos that are visible to the public and deemed offensive, immoral, or presenting an unprofessional appearance, as deemed by the Chief of Police, shall require the officer to cover said tattoo with a bandaging type material or a long sleeve shirt in accordance with the Uniform of the Day Standards."

On October 17, 2002, Detective Keith Knight, another officer in the department, wrote a letter to Michael Wood, president of the Hartford Police Union, raising several concerns.  Knight provided copies of his letter to City of Hartford officials, including Chief Marquis, and the mayor, deputy mayor, city manager and council members.  One concern raised by Knight in his letter was tattoos of certain officers in the department.  Specifically, Knight's letter stated:

> Lets debate the issue of a white supervisor along with two other white police officers wearing a racist tattoo of a white supremacy group called the Arian Nation [sic].  The tattoo which is a spider web tattoo, which I am informed by the Department of Corrections who monitors such groups that the tattoo symbolizes race hatred of non-whites and Jews.  I know the U.S. Constitution gives everybody the right to free speech and expression, but this is unacceptable for a police officer to wear in plain view knowing that it offends and what it stands for.  Where is the enthusiastic debate on this issue?[2]

After receiving a copy of Knight's letter, the Hartford city manager informed Chief Marquis that

---

[2] At the time of Knight's letter, only Inturri, Miele and Rooney had the spider web tattoos. At some point in March, 2003, Besse and Castagna obtained spider web tattoos as well.  The complaint states that Besse and Castagna obtained their tattoos as a form of protest and solidarity after criticism was first leveled at the other three plaintiffs.

the issue of the spider web tattoos was a concern to the mayor and at least some of the members

of the city council, and asked him to resolve the situation.  Chief Marquis then consulted with the

Office of the Corporation Council ("OCC") for the City of Hartford, as well as a contact at the

Federal Bureau of Investigation's Legal Investigation Unit.  The command staff of the

department[3] then discussed the matter and decided that, pursuant to General Order 6-15, spider

web tattoos should be covered while the officers were on duty or in uniform.  In reaching this

conclusion, the command staff and Chief Marquis stated that they considered the following: an

internet web-site maintained by the Anti-Defamation League; the racial composition of the City

of Hartford (which is almost seventy percent non-Caucasian); a history of troubled race relations

between the population of Hartford and members of the police department; the racial

composition of the police department; a consent decree involving the department in Cintron v.

Vaughan[4]; Article XII of the department's Code of Conduct, which addresses discriminatory acts

_____

[3]Although the stipulation of facts makes numerous references to "the command staff of
the department," it does not identify the other members of that group, but included Chief
Marquis.

[4]In Cintron v. Vaughan, 3:69cv13578(EBB), a settlement stipulation was approved by the
district court and entered as a consent decree on June 21, 1973.  The Cintron case was
summarized as follows:

> Cintron involved a challenge, by a class of Hartford residents 'who are members
> of the Black or Puerto Rican-Spanish American racial group or both,' to an
> allegedly systematic pattern of police misconduct and discrimination towards
> members of racial minority groups. Named as defendants were various police
> officers and city officials of the City of Hartford. . . . The consent decree which
> was entered in Cintron provided, in Part II, for a variety of police procedures
> designed to prevent racially discriminatory practices by the police department. In
> Part III, the decree provided that the Hartford Police Department would maintain
> and improve its affirmative action plan in order to recruit and promote more
> minority police officers.

Pollard v. City of Hartford, 539 F.Supp. 1156, 1162 (D.Conn. 1982).

by police officers; and Chief Marquis' information from the FBI.  In particular, the ADL website

had a page entitled "Hate on Display: A Visual Database of Extremist Symbols, Logos and

Tattoos," which included the spider web design in a display of such tattoos.  A separate page

providing details about the spider web tattoo described it as being favored by "racist convicts"

and, in the "Background/History" section, stated the following:

> The spider web tattoo is often found on the arm, or under the arm, of racists who
> have spent time in jail.  In some places, one apparently "earns" this tattoo by
> killing a minority.  However, non-extremists may sometimes sport this tattoo as
> well, unaware of its other symbology, simply because they like the design.

The stipulation of facts here also indicates that, in reaching their conclusion that spider

web tattoos should be covered, a "major concern [of the command staff of the department] was

that in a predominantly minority community, responding police officers who sport tattoos that

have been associated with white supremacist groups may result in an explosive situation,

endangering both the officers and the community."

On April 14, 2003, Chief Marquis revised Section III.C.5 of General Order 6-15 as

follows: "The Chief of Police has the authority to order personnel to cover tattoos that are

deemed offensive and/or presenting an unprofessional appearance.  Personnel shall cover the

tattoo with either a flesh tone, navy blue or white type material that matches the uniform shirt or

wear a long sleeve shirt in accordance with the Winter Uniform of the Day Standard."  On that

same day, Chief Marquis, "acting as a final policy maker and pursuant to official policy," issued a

memorandum to all officers which stated: "It has been determined that a visible spider web tattoo

is offensive, and therefore as Chief of Police and in consultation with Corporation Counsel, I am

ordering everyone to cover this tattoo, in accordance with [General] Order 6-15, while you are in

4

an on-duty capacity or wearing the Hartford Police Uniform." The plaintiffs have complied with the order by covering their tattoos with either sweatband-type material or by wearing long sleeve shirts. Accordingly, they have not been disciplined or lost any pay as a result of the issuance of the April 14, 2003 memorandum.[5] Other officers in the department, including one or more of the plaintiffs, also have arm tattoos other than the spider web design. They have not been directed to cover these other tattoos.

Finally, the defendants state that they have no evidence that the plaintiff police officers have this particular tattoo as "symbols of any racist or anti-Semitic philosophy or statement," and the plaintiffs have made clear that they do not intend the tattoos to have any symbolic effect; they state they were unaware that the spider web tattoo had any such connotation.[6]

## II    Procedural History

The plaintiffs have filed a two-count complaint in this Court. Count one alleges that the defendants violated 42 U.S.C. §§ 1983 by denying them their right to free expression under the First and Fourteenth Amendments of the United States Constitution and by singling them out for

---

[5]It is also important to note that, at all relevant times, there was a collective bargaining agreement ("CBA") in effect between the City of Hartford and the Hartford Police Union, of which the plaintiffs were and are members, which provided that discipline shall be meted out only for "just cause."

[6]It is undisputed Chief Marquis' April 14, 2003 memorandum ordering spider web tattoos covered was issued pursuant to official policy, and that Chief Marquis was a "municipal policy maker" for purposes of the plaintiffs' § 1983 claims against the City of Hartford. See Monell v. Dep't of Social Servs., 436 U.S. 658, 694 (it is only when the execution of a municipality's "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the [municipality] as an entity is responsible under § 1983"); Russo v. City of Hartford, 158 F.Supp.2d 214, 223 (D.Conn. 2001) ("by pleading that [the Chief of Police] was the ultimate decision maker with regard to the policies at issue in this case, [the plaintiff] has stated a § 1983 claim upon which relief can be granted against the City of Hartford").

different treatment in violation of the Equal Protection Clause of the Fourteenth Amendment.

Count two alleges that Section III.C.5 of General Order 6-15 is unconstitutionally vague and

overbroad.  The defendants have denied the allegations in the complaint and set forth several

special defenses.  As mentioned, the parties have moved for summary judgment, and this opinion

considers both motions.

**III    Summary Judgment Standard**

A motion for summary judgment may be granted "if the pleadings, depositions, answers

to interrogatories, and admissions on file, together with affidavits ... show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed.R.Civ.P. 56(c).  A party seeking summary judgment "bears the burden of

establishing that no genuine issue of material fact exists and that the undisputed facts establish

[its] right to judgment as a matter of law." Rodriguez v. City of New York, 72 F.3d 1051,

1060-1061 (2d Cir. 1995) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)).  A

dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could

return a verdict for the  nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986).  When addressing a motion for summary judgment, a court must resolve "all ambiguities

and draw all inferences in favor of the nonmoving party in order to determine how a reasonable

jury would decide." Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992).

"Only when reasonable minds could not differ as to the import of the evidence is summary

judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  Therefore, summary

judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient

showing on an essential element of [its] case with respect to which [it] has the burden of proof."

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

_____ "When faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other. . . . 'Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993) (quoting Schwabenbauer v. Board of Educ. of Olean, 667 F.2d 305 (2d Cir. 1981)); see also 11 Moore's Federal Practice 3d § 56.10[6] (Matthew Bender Ed.) (citing cases).

## IV    Count One

As noted previously, count one alleges that the defendants violated the plaintiffs' rights to freedom of expression and equal protection under the law, in violation of 42 U.S.C. § 1983.

### A) Freedom of Expression

As mentioned, the plaintiffs asserted claims in the complaint under the First and the Fourteenth Amendments of the U.S. Constitution based on their right to freedom of expression. However, in their summary judgment papers and at argument on the motions, they withdrew these claims, maintaining that their spider web tattoos are not "expressive conduct." See Zalewska v. County of Sullivan, 316 F.3d 314, 321 (2d Cir. 2003).  In other words, not only do the plaintiffs state that the tattoos do not express the racist meaning expressed in the ADL website, they are not intended to express any meaning whatsoever; they merely are decorative, like many tattoos.

Accordingly, the defendants are entitled to summary judgment on plaintiffs' claim that they were denied their rights to freedom of expression under the First and Fourteenth

7

Amendments, in violation of § 1983.

B) Equal Protection

The Fourteenth Amendment to the United States Constitution provides that "no state shall

... deny to any person within its jurisdiction the equal protection of the laws," and is "essentially a

direction that all persons similarly situated should be treated alike." City of Cleburne, Texas v.

Cleburne Living Center, 473 U.S. 432, 439 (1985).  More specifically, "the purpose of the equal

protection clause of the Fourteenth Amendment is to secure every person within the State's

jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms

of a statute or by its improper execution through duly constituted agents."  Village of

Willowbrook v. Olech, 528 U.S. 562, 564 (2000); see also Sioux City Bridge Co. v. Dakota

County, 260 U.S. 441, 445 (1923); Sunday Lake Iron Co. v. Township of Wakefield, 247 U.S.

350, 352 (1918).  As recently noted in this district, "[a] plaintiff claiming denial of equal

protection rights can proceed according to several theories. The United States Supreme Court has

recently held that a plaintiff need not be a member of a traditionally 'protected class' in order to

allege an equal protection violation."  Tuskowski v. Griffin, __ F.Supp.2d __, __, 2005 WL

599312 (D.Conn. 2005, Mar. 14, 2005); see also Harvey v. Mack, 352 F.Supp.2d 285, 290

(D.Conn. 2005) (same).  Rather, a plaintiff may maintain a "class of one" equal protection claim,

as long as the plaintiff alleges that he or she was treated differently than similarly situated

persons, and there was no rational basis for that differential treatment.  Id. (citing Village of

Willowbrook v. Olech, 528 U.S. at 564).  In addition, a plaintiff also may assert a "selective

prosecution" equal protection claim.  See Cobb v. Pozzi, 363 F.3d 89, 110 (2d Cir. 2004) (setting

forth the standard for a selective prosecution claim).  In the complaint, the plaintiffs allege that

Chief Marquis' April 14, 2003 memorandum ordering them to cover their spider web tattoos

"results in the plaintiffs being treated differently than similarly situated police officers with

visible tattoos."  The complaint also alleges that the defendants violated their rights under the

Fourteenth Amendment "[b]y arbitrarily and capriciously singling out the plaintiffs for

differential treatment . . . ."  These allegations appear to raise both an Olech "class of one" claim

and a "selective prosecution" claim.  In their memoranda, however, the plaintiffs have briefed all

three of the different equal protection theories noted previously.  Consequently, because the

Court is unable to ascertain which theories the plaintiffs are proceeding under, all three will be

addressed.

       1) "Protected Class"

       Traditionally, the Equal Protection clause of the Fourteenth Amendment protects against

class-based discrimination.  See, e.g., Plyler v. Doe, 457 U.S. 202, 213 (1982) ("The Equal

Protection Clause was intended to work nothing less than the abolition of all caste-based and

invidious class-based legislation."); United States v. Batchelder, 442 U.S. 114, 125 n. 9 (1979)

("The Equal Protection Clause prohibits selective enforcement based upon an unjustifiable

standard such as race, religion, or other arbitrary classification") (quotation marks omitted).  As

the United States Supreme Court has explained:

> [W]e apply different levels of scrutiny to different types of classifications. At a
> minimum, a statutory classification must be rationally related to a legitimate
> governmental purpose. . . . Classifications based on race or national origin . . . and
> classifications affecting fundamental rights . . . are given the most exacting
> scrutiny. Between these extremes of rational basis review and strict scrutiny lies a
> level of intermediate scrutiny, which generally has been applied to discriminatory
> classifications based on sex or illegitimacy. . . .

Clark v. Jeter, 486 U.S. 456, 461 (1988).  More recently, the Second Circuit noted that rational

basis review generally applies, and that the higher forms of review–strict scrutiny and intermediate scrutiny–apply in the "limited circumstances" where "the subject of the different treatment is a member of a class that historically has been the object of discrimination." Able v. U.S., 155 F.3d 628, 631-32 (2d Cir. 1998). Here, the plaintiffs argue that the Court should apply intermediate scrutiny to their equal protection claim, while the defendants maintain that the Court should apply the rational basis standard of review.

Under intermediate scrutiny, the government must show that the challenged legislative enactment or action by an official is substantially related to an important governmental interest. Wengler v. Druggists Mut. Ins. Co., 446 U.S. 142, 150 (1980); see also United States v. Virginia, 518 U.S. 515, 532-33 (1996) (under intermediate scrutiny, the government must articulate an "exceedingly persuasive" justification for using the otherwise discouraged classification). As the Second Circuit has explained, in order to trigger intermediate scrutiny, a challenged law must employ some sort of 'quasi-suspect classification.'" U.S. v. Coleman, 166 F.3d 428, 431 (2d Cir. 1999). Classifications that have been recognized as "quasi-suspect" are gender and illegitimacy. Ramos v. Town of Vernon, 353 F.3d 171, 175 (2d Cir. 2003); see, e.g., Mills v. Habluetzel, 456 U.S. 91, 98-99 (1982) (applying intermediate scrutiny to an equal protection challenge involving illegitimate children); Craig v. Boren, 429 U.S. 190, 197 (1976) (applying intermediate scrutiny to equal protection challenge involving gender); see also Able v. U.S., 155 F.3d 628, 632 (2d Cir. 1998) (noting that heightened scrutiny in equal protection cases has been limited to groups generally defined by their status, such as gender and illegitimacy, and not by the conduct in which they engage). The plaintiffs concede that they are not members of a quasi-suspect class. The plaintiffs claim, however, that "[o]n occasion intermediate scrutiny has [also] been applied

10

to review a law that affects 'an important, though not constitutional, right.'" <u>Ramos</u>, 353 F.3d at

175 (citing <u>Coleman</u>, 166 F.3d at 431).  Here, the plaintiffs further claim that Chief Marquis'

order affects such a right and, therefore, intermediate scrutiny is applicable.

As noted previously, the plaintiffs concede that their spider web tattoos are not conveying

any speech or message, but merely are related to personal appearance.  The plaintiffs contend that

their right to personal appearance is an "important, but not constitutional right."  However,

having a visible tattoo devoid of any intended meaning while on-duty as a police officer cannot

be said to be the exercise of an "important, but not constitutional, right," as courts consistently

have upheld the ability of public employers to regulate the appearance of their employees.  <u>See</u>

<u>e.g.</u>, <u>Kelley, Commissioner Suffolk County Police Dep't v. Johnson</u>, 425 U.S. 238, 245 (1976)

("we have sustained comprehensive and substantial restrictions upon activities of both federal

and state employees lying at the core of the First Amendment); <u>Lowman v. Davies</u>, 704 F.2d

1044, 1046 (8th Cir. 1983)(Lay, C.J., dissenting) ("It is well established that the state may

regulate the personal appearance of its employees if the state has rational, nonarbitrary reasons

for doing so"); <u>see also</u> <u>Blau v. Fort Thomas Public School District</u>, No. 03-6337, __ F.3d __

(6th Cir., Feb. 8, 2005) (rejecting a student's challenge to the school dress code because "she

does not wish to convey any particular message, but wishes only to wear clothes that she thinks

'looks nice on her' and that 'she feels good in'").   This latitude has been recognized many times

with clothing and appearance issues involving police officers.  <u>See e.g.</u>, <u>Kelley</u>, 425 U.S. at 245

(1976) (noting that it was "highly significant" that the plaintiff subject to the restriction on

personal appearance was a police officer and not a member of the public; police department's

regulations "infringe[d] on respondent's freedom of choice in personal matters"); <u>Riggs v. City of</u>

11

<u>Fort Worth</u>, 229 F.Supp.2d 572, 581 (N.D.Tex. 2002) ("Courts have long held that 'the city though its police chief has the right to promote a disciplined, identifiable, and impartial police force by maintaining its police uniform as a symbol of neutral government authority, free from expressions of personal bent or bias")(quoting <u>Daniels v. Arlington</u>, 246 F.3d 500, 503 (5th Cir. 2001)).  Moreover, the conclusion that the plaintiffs' claimed right to have their spider web tattoos visible while on duty or in uniform is not an "important, but not constitutional" right is buttressed by a comparison to other rights that courts have found to be "important, but not constitutional," and therefore requiring intermediate scrutiny.  <u>See, e.g.</u>, <u>Ramos</u>, 353 F.3d at 172, 175 (concluding that intermediate scrutiny applied to town's juvenile curfew; although infringement of an adult's"freedom of movement" would implicate strict scrutiny, in the context of juveniles, the curfew was subject only to intermediate scrutiny); <u>Eisenbud v. Suffolk County</u>, 841 F.2d  42, 45 (2d Cir. 1988) (applying intermediate scrutiny to county's financial disclosure law for certain county employees, which implicated the right to privacy, yet did not require heightened scrutiny).  In those cases, the "rights" were closely related to a recognized constitutional right, yet subject to a strong countervailing consideration–such as the parties' status as juveniles or a county's important interest in deterring corruption and enhancing public confidence in the integrity of the government.  The plaintiffs here have not identified such an analogous right, or a similar countervailing consideration.

The plaintiffs contend, however, that both the Supreme Court and the Second Circuit "have presumed the existence of a liberty interest in one's personal appearance," and cite <u>Kelley, Commissioner Suffolk County Police Dep't v.Johnson</u>, 425 U.S. at 244; <u>Zalewska v. County of Sullivan</u>, 316 F.3d at 321; and <u>East Hartford Ed. Ass'n v. Board of Ed. of the Town of East</u>

12

Hartford, 562 F.2d 838, 861 (2d Cir. 1977).  Thus, although conceding that a public employer

may place restrictions on personal appearance in the workplace, the plaintiffs claim that this case

involves the "ability of the defendants to make arbitrary decisions about the meaning of their

appearance and, therefore, discriminate on the basis of some vague notion that someone will be

offended."  The presumption of a liberty interest in those cases, however, was in the context of

substantive due process challenges to restrictions on personal appearance, and not in the context

of equal protection challenges.  The plaintiffs have not asserted a substantive due process

challenge in this case based on a liberty interest in one's preferred appearance, but rather rely

exclusively on their equal protection challenge.[7]  Indeed, the Court notes that, even though the

Second Circuit presumed the existence of a liberty interest in personal appearance in the due

process context in Zalewska, it applied the rational basis standard of review to the plaintiffs'

equal protection claim in that case.  See also Riggs, 229 F.Supp.2d at 583 (applying rational basis

standard of review to officer's claim that he was selectively treated on account of his tattoos).

Finally, it hardly seems that the reasoning of the decisions which have discussed the suggested

liberty interest in personal appearance are enough to elevate that interest to warrant intermediate

scrutiny in the Fourteenth Amendment context, as in every case cited by the plaintiffs the

restriction on personal appearance was found to be constitutional.  Indeed, intermediate scrutiny

has consistently been reserved for classifications such as gender, illegitimacy, and other

important rights such as freedom of movement–areas in apparent need of greater scrutiny than

the personal appearance of on-duty police officers.  See Zalewski, 316 F.2d at 321.  Therefore,

---

[7]Plaintiffs' counsel confirmed at oral argument that there was no substantive due process
claim being asserted.

the Court finds that rational basis, rather than intermediate scrutiny, is the applicable standard of review.[8]

Rational basis review requires that the law be rationally related to a legitimate government interest. Ramos v. Town of Vernon, 353 F.3d at 175 (citing Allied Stores of Ohio, Inc. v. Bowers, 358 U.S. 522, 528-29 (1959)); Burke Mountain Acad., Inc. v. United States, 715 F.2d 779, 783 (2d Cir. 1983)).  A law or other official action will survive this level of scrutiny unless the plaintiff demonstrates that the class-based distinctions are wholly irrational.  See, e.g., Hodel v. Indiana, 452 U.S. 314, 331-32 (1981).  In other words, under rational basis review, "a classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." Connolly v. McCall, 254 F.3d 36, 42 (2d Cir. 2001) (quoting Heller v. Doe, 509 U.S. 312, 320 (1993)). Moreover, the Second Circuit has cautioned that "rational basis review in equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." Id.

In the instant case, the stipulated facts demonstrate that Chief Marquis and the command staff of the department were concerned that the spider web tattoos could negatively affect relations among the officers in the department, and between the officers in the department and the citizens of Hartford–especially those from minority groups.  This concern stems from a prior

---

[8]Even if the plaintiffs were asserting a substantive due process claim based on the claimed liberty interest in personal appearance, the Court's conclusion would be that Chief Marquis' order requiring that the tattoos be covered met the rational basis test, as described further in the text of this ruling.  See, e.g., Blau v. Fort Thomas Public School District, 2005 WL 291514, __ F.3d __, __ (6th Cir., Feb. 8, 2005) (applying rational basis review to student's claim that a school "dress code's prohibition on blue jeans" violated the student's substantive due process rights under the Fourteenth Amendment).

history of troubled race relations in Hartford, and more specifically, from certain particular recent events which have raised such tensions. The Court finds that this constitutes a legitimate government interest. After seeking out advice from groups such as the FBI and the City's attorneys, and consulting the ADL website, Chief Marquis concluded that the display of spider web tattoos may affect the department's legitimate interest in fostering harmonious race relations both within the department and within the community. Plaintiffs may disagree with Chief Marquis and the ADL as to the message–if any–the tattoos convey, but the Chief at least had a rational basis and justification for ordering that the tattoos be covered.[9] Therefore, the Court finds that Chief Marquis' memorandum ordering that such tattoos be concealed while an officer is on duty or in uniform is rationally related to the department's legitimate interest in fostering harmonious race relations both within the department and within the community. See Kelly, 425 U.S. at 247 (finding a "rational connection between the regulation [of a police officer's appearance]. . . and the promotion of safety of persons and property").

     2) "Class of One"

In Olech, the Supreme Court reaffirmed that it has long "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Id; accord African Trade & Info. Ctr., Inc. v. Abromaitis, 294

---

[9]In support of their claim that Chief Marquis' order fails even rational basis review, the plaintiffs argue that "[t]he defendants conclude[d] that plaintiffs' tattoos were 'offensive' solely because one person thought it was." That argument, however, is unsupported by the stipulation of facts, which reveals that Chief Marquis and the command staff of the department sought information from a variety of sources on the meaning of spider web tattoos, and did not rely solely on conclusions set forth in the letter received from Detective Knight.

F.3d 355, 364 (2d Cir. 2002) (explaining the two criteria of the Olech "class of one" standard).[10]

As to the first criterion, courts consistently have stated that, "[t]o be considered similarly

situated, employees must be similarly situated in all material respects." Tuskowski v. Griffin, __

F.Supp.2d at __, 2005 WL 599312 (citing cases). Here, there is no dispute that only the

plaintiffs' visible *spider web* tattoos have been ordered covered by Chief Marquis, and that no

action has been taken against any other officers in the police department with other visible

tattoos. Consequently, the Court assumes that, for purposes of the pending motions for summary

judgment, the plaintiffs have been intentionally treated differently from other similarly situated

police officers. See Harlen Assocs., Inc. v. Vill. of Mineola, 273 F.3d 494, 499 n. 2 (2d Cir.

2001) ("As a general rule, whether [individuals] are similarly situated is a factual issue that

should be submitted to the jury.")

Again, the second criterion to a "class of one" equal protection claim requires a plaintiff

to demonstrate that "there is no rational basis for the difference in treatment." Olech, 528 U.S. at

564. A government official's decision "can be considered irrational only when [the official] acts

with no legitimate reason for [his or her] decision." Harlen Assocs., 273 F.3d at 500 (internal

quotation marks omitted); accord Harvey v. Mack, 352 F.Supp.2d at 290. In other words, the

official's act must be "irrational and wholly arbitrary." African Trade & Info. Ctr., Inc. v.

---

[10]Although titled "class of one" claims, such a claim may be brought by groups comprised
of more than one plaintiff. See, e.g., Olech, 528 U.S. at 564 ("Whether the complaint alleges a
class of one or of five is of no consequence because we conclude that the number of individuals
in a class is immaterial for equal protection analysis"); Cobb v. Pozzi, 363 F.3d at 110-12
(addressing a "class of one" claim brought by two corrections officers); see also Hayes v. City of
Torrington, 2004 WL 1498135 at *1 (D.Conn., May 26, 2004) ("In their pleadings, Defendants
have suggested that 'class of one' claims are limited to classes of exactly one person. Defendants
are wrong").

Abromaitis, 294 F.3d at 364; Giordano v. City of New York, 274 F.3d 740, 751 (2d Cir. 2001);

Christman v. Kick, 342 F.Supp.2d 82, 92 n.10 (D.Conn. 2004).   In Part IV(B)(1) of this ruling,

the Court found that Chief Marquis' directive ordering the spider web tattoos covered was

rationally related to a legitimate government interest.  For all of the reasons set forth in that

discussion, the Court finds that the plaintiffs cannot, as a matter of law, demonstrate that there

was no rational basis for the difference in treatment.  Olech, 528 U.S. at 564.

       3) "Selective Prosecution"

    In an Olech "class of one" claim, a plaintiff must demonstrate that there was no rational

basis for the differential treatment, whereas in a "selective prosecution" claim, a plaintiff must

demonstrate that differential treatment was based on an impermissible reason.  See Cobb v.

Pozzi, 363 F.3d at 109 (noting that a class of one claim and a selective prosecution claim are

"two related, yet different, equal protection arguments");  African Trade & Info. Ctr, 294 F.3d at

364 (distinguishing between the two claims).  Plaintiffs asserting a selective prosecution claim

are "required to show both (1) that they were treated differently from other similarly situated

individuals, and (2) that such differential treatment was based on impermissible considerations

such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious

or bad faith intent to injure a person." Cobb v. Pozzi, 363 F.3d at 110; accord  Harlen Assocs. v.

Inc. Vill. of Mineola, 273 F.3d at 499; Charron v. City of Hartford, __ F.Supp.2d __, __

(D.Conn., Feb. 16, 2005); Harvey v. Mark, 352 F.Supp.2d at 290-91.  Even if the Court assumes

that the plaintiffs were intentionally treated differently than similarly situated police officers in

the department, the plaintiffs have not set forth any evidence demonstrating that the differential

treatment was based on impermissible considerations such as race, religion, intent to inhibit or

punish the exercise of constitutional rights, or on a malicious or bad faith intent.

Accordingly, the defendants are entitled to summary judgment on plaintiffs' claim that they were denied their rights to equal protection under the Fourteenth Amendment, in violation of § 1983.

### B) Count Two

In count two, the plaintiffs claim that Section III.C.5 is unconstitutionally vague on its face and as applied, and that it is unconstitutionally overbroad for interfering with the rights of the plaintiffs to express themselves freely.[11]   Each claim will be addressed in turn.[12]

### 1) Facial Challenge

To show an enactment is unconstitutionally vague on its face, "[t]he complainant must prove that the enactment is vague 'not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all. Such a provision simply has no core.' " Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 n.7 (1982) (quoting Smith v. Goguen, 415 U.S. 566, 578 (1974) (citation omitted)).  "[V]agueness challenges to [enactments] which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." Id. at 495 n.7; accord U.S. v. Rybkicki, 354 F.3d 124, 129-30 (2d Cir. 2003).

---

[11]It is important to note that in count one the plaintiffs were challenging Chief Marquis' April 14, 2003 memorandum which ordered them to cover their visible spider web tattoos, while in count two the plaintiffs are challenging Section III.C.5, which provided Chief Marquis with the authority to issue that memorandum.

[12]Although the defendants' motion for summary judgment claims that they are moving for summary judgment on the complaint "in its entirety," they have failed to brief the issue of vagueness or overbreadth.  Despite this deficiency, the Court construes the defendants' motion as one seeking summary judgment as to all claims, including the vagueness and overbreadth claims.

In other words, when the interpretation of an enactment does not implicate First Amendment

rights, it is assessed for vagueness only "as applied . . . and not with regard to the statute's facial

validity." United States v. Nadi, 996 F.2d 548, 550 (2d Cir. 1993); see also Rybkicki, 354 F.3d at

130 ("outside the First Amendment context, vagueness challenges will be considered only as

applied"); United States v. Whittaker, 999 F.2d 38, 42 (2d Cir. 1993) ("Other than in the First

Amendment context, vagueness challenges also must be examined in light of the facts of the

case, on an as-applied basis") (citation and internal quotation marks omitted); United States v.

Coonan, 938 F.2d 1553, 1562 (2d Cir. 1991) ("In the absence of first amendment considerations,

vagueness challenges must be evaluated based on the particular application of the statute and not

on the ground that the statute may conceivably be applied unconstitutionally to others in

situations not before the Court") (internal citation, quotation marks and brackets omitted); U.S. v.

Peterson, __ F.Supp.2d __, __, 2005 WL 457724 (S.D.N.Y., Feb. 28, 2005) (conducting "as

applied" analysis only because no First Amendment rights were implicated).  As noted

previously, although the complaint alleged violations of the plaintiffs' First Amendment rights,

the plaintiffs have since abandoned those allegations.  Consequently, their facial challenge to

Section III.C.5 must fail.[13]

---

[13]Although in some limited situations a facial challenge to a statute that does not
implicate the First Amendment may be brought, there is considerable disagreement as to what
standard would be applied.  In United States v. Salerno, 481 U.S. 739, 745 (1987), the Supreme
Court noted in dicta that the test for facial unconstitutionality if the challenge is not raised under
the First Amendment is whether any "set of circumstances exists under which the [statute in
question] would be valid. The fact that the [statute] might operate unconstitutionally under some
conceivable set of circumstances is insufficient to render it wholly invalid, since [the Court] has
not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment."  In
a more recent case, however, a plurality of the Supreme Court stated that, "[t]o the extent we
have consistently articulated a clear standard for facial challenges, it is not the Salerno
formulation, which has never been the decisive factor in any decision of this Court, including

2) "As Applied" Challenge

The Due Process clause of the Fourteenth Amendment requires "that laws be crafted with sufficient clarity to 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited' and to 'provide explicit standards for those who apply them'" General Media Communications, Inc. v. Cohen, 131 F.3d 273, 286 (2d Cir. 1997) (quoting Grayned v. City of Rockford, 408 U.S. 104, 108 (1972). The Second Circuit has held, however, that a statute or regulation is not required to specify every prohibited act. Perez v. Hoblock, 368 F.3d 166, 175 (2d. Cir. 2004) (citing cases); see also Rock of Ages Corp. v. Sec'y of Labor, 170 F.3d 148, 156 (2d Cir. 1999) ("regulations need not achieve 'meticulous specificity' and may instead embody 'flexibility and reasonable breadth.' " (quoting Grayned, 408 U.S. at 110)). "Limitations inherent in the English language often prevent the drafting of statutes 'both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited.'" Perez, 368 F.3d at 175 (quoting Arnett v. Kennedy, 416 U.S. 134, 159-60 (1974)). In addition, a court must be mindful that the Supreme Court has expressed "greater tolerance of enactments with civil rather than criminal penalties because the

---

Salerno itself ...." City of Chicago v. Morales, 527 U.S. 41, 54 n.2 (1999) (opinion of Stevens, J.). To the contrary, the plurality in Morales stated that, in order to find that a statute which does not implicate First Amendment rights vague on it face, "a court would have to conclude that the law is 'permeated' with vagueness, and, perhaps, that it infringes on a constitutional right and has no mens rea requirement." U.S. v. Rybicki, 354 F.3d 124, 131 (2d Cir. 2003) (explaining the new approach set forth in Morales). Because the Morales formulation has not been adopted by a majority of the Supreme Court, and the Salerno formulation was announced in dicta and disagreed with in Morales, the Second Circuit has not expressed which formulation should be followed. See Rybicki, 354 F.3d at 132 n.3 (declining to adopt or express a preference for either Salerno or Morales). This Court need not decide which test, if any, applies to a facial challenge outside of the context of the First Amendment because, under either test, Section III.C.5 is sufficiently clear to survive such a challenge.

consequences of imprecision are qualitatively less severe." Village of Hoffman Estates, 455 U.S. at 498-99.[14]

In an "as-applied" vagueness challenge, a court must look at the "actual conduct" of the plaintiffs, and not "hypothetical situations at the periphery of the regulation's scope or with respect to the conduct of the other parties whom might not be forewarned by the broad language." Id. (quoting diLeo v. Greenfield, 541 F.2d 949, 953 (2d Cir. 1976). In other words, a court must evaluate the challenged regulation "in light of the specific facts of the case at hand . . . ." U.S. v. Rybicki, 354 F.3d 124, 129 (2d Cir. 2003) (quoting U.S. v. Nadi, 996 FF.2d 548, 550 (2d Cir. 1993)). Moreover, when considering an "as-applied" challenge, a court must consider the context in which the regulation was enforced, i.e., it must evaluate the underlying conduct by reference to the norms of the subject community. Perez, 368 F.3d at 175-76 (evaluating the claim made by a "veteran of the horse-racing industry" within the context of the "racing community"); see also Grayned v. City of Rockford, 408 U.S. at 112 (ordinance gave fair notice given the "particular context" of the case); Rock of Ages Corp., 170 F.3d at 156 ("regulations satisfy due process as long as a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, has fair warning of what the regulations require").[15] Finally, because "[t]he vagueness doctrine is based

---

[14]The Court of Appeals for the Seventh Circuit has noted, in the context of a challenge to a rule adopted by the Milwaukee Police Department to regulate the conduct of its members, that "it is well-settled that the prohibition against vagueness extends to administrative regulations affecting conditions of governmental employment as well as to penal statutes, for the former may be equally effective as a deterrent to the exercise of free speech as the latter." Bence v. Breier, 501 F.2d 1185, 1188 (7th Cir. 1974).

[15] Cranston v. City of Richmond, 40 Cal.3d 755, 221 Cal.Rptr. 779, 710 P.2d 845, 851 (1985) (rejecting vagueness challenge to "conduct unbecoming" administrative regulation for

on notions of fair notice or warning," a specific warning to a plaintiff about what conduct is prohibited will render a claim of vagueness "untenable." Janusaitis v. Middlebury Volunteer Fire Dep't, 607 F.2d 17, 27 (2d Cir. 1979) (quotation marks omitted).

As noted previously, the plaintiffs' vagueness challenge is to the 2003 version of Section III.C.5 of General Order 6-15, which provides: "The Chief of Police has the authority to order personnel to cover tattoos that are deemed offensive and/or presenting an unprofessional appearance. Personnel shall cover the tattoo with either a flesh tone, navy blue or white type material that matches the uniform shirt or wear a long sleeve shirt in accordance with the Winter Uniform of the Day Standard." On its face, Section III.C.5 fails to identify any specific tattoos that need to be covered, and merely provides Chief Marquis with the authority to order specific tattoos covered if they are deemed "offensive and/or presenting an unprofessional appearance." Therefore, under Section III.C.5, a police officer is able to display a tattoo while on duty or in uniform until Chief Marquis issues a subsequent order declaring that tattoo to be "offensive and/or presenting an unprofessional appearance."

Here, pursuant to the authority granted to him in Section III.C.5, Chief Marquis issued a memorandum on April 14, 2003, which required all police officers to cover visible spider web tattoos. At such time as that memorandum was issued, the plaintiffs had sufficient notice that having their spider web tattoos visible while on duty or in uniform was prohibited conduct, and that those tattoos must be covered. It is only when the plaintiffs here would choose to display

---

governmental employment because, "where the language of a statute fails to provide an objective standard by which conduct can be judged, the required specificity may nonetheless be provided by the common knowledge and understanding of members of the particular vocation or profession to which the standard applies").

their tattoos by removing the covering materials that they would be in violation of an order from

Chief Marquis, and they would then have sufficient notice of that potential uniform violation

before it occurred.   Consequently, their claim that Section III.C.5 is unconstitutionally vague "as-

applied" to them is untenable.  See  Perez, 368 F.3d at 177-78 (rejecting a vagueness claim

because the plaintiff was on notice that he would be fined if he did not cease his disruptive

behavior); Janusaitis, 607 F.2d at 27 (firefighter's dismissal for violation of department rule that

proscribed "unbecoming conduct detrimental to the welfare or good name of the Department"

was not vague as applied because firefighter had specific warning that his conduct would violate

that rule); In re Bithoney, 486 F.2d 319, 324 (1st Cir. 1973) (holding that because respondent

received a direct and specific warning from the court that his "continued abuse of ... process"

would constitute "conduct unbecoming a member of the bar," regulation under which respondent

was penalized was not vague); cf. diLeo v. Greenfield, 541 F.2d 949, 953 (2d Cir. 1976) (finding

that because teacher's "persistent pattern of neglecting his professional duties and harassing and

humiliating students ... continued and worsened after [plaintiff] met with school administrators,"

plaintiff could not reasonably claim not to know that his behavior "constituted due and sufficient

cause for dismissal").

Plaintiffs likely would argue that this is a distinction without a difference, as they really

have no choice; the tattoos are permanent and it was the decision to obtain the tattoo rather than

to later cover it that needed advance specific guidance.  However, the burden of covering those

tattoos with the sweatband-type material is not substantial enough to eliminate that distinction,

especially since no expressive conduct is claimed, no interference with the plaintiffs' ability to

perform their duties has been raised and no significant personal discomfort has been argued.

23

The context in which Section III.C.5 and Chief Marquis' subsequent order were enforced against the plaintiffs further compels the conclusion that their "as-applied" vagueness challenge must fail.  First, although the plaintiffs' challenge is to 2003 version of Section III.C.5, the Court notes that the first version of Section III.C.5 was adopted in 1997.  That first version provided that: "Tattoos that are visible to the public and deemed offensive, immoral, or presenting an unprofessional appearance, as deemed by a supervisor, shall require the officer to cover said tattoo with a bandaging type material or a long sleeve shirt in accordance with the Uniform of the Day standards."  Since at least 1997, therefore, the plaintiffs have had general notice that tattoos are subject to regulation by the command staff of the department while they are on duty or in uniform.  The plaintiffs were surely aware before they obtained their visible spider web tattoos that those tattoos were subject to review by their superiors, and could be ordered covered while on duty or in uniform.

Second, the Hartford Police General Orders that regulate the personal appearance of police officer are very specific when possible.  The General Orders regulate such areas as "length/style of hair," "detective/civilian dress code," "seasonal uniform standards," and others.  General Order 6-15, Revision of April 14, 2003.  Thus, the authority granted to Chief Marquis in Section III.C.5 to regulate visible tattoos is part of a broad framework which regulates numerous other aspects of an officer's appearance.  Although many of the regulations set forth in the General Orders are specifically detailed, others in the "Personal Appearance Standards" section invest Chief Marquis with considerable discretion and rely on broad terms such as

24

"unprofessional appearance."[16]   It would daunting indeed for the General Orders to set out the

specific tattoos which are deemed offensive and to keep that list current.  Much like conduct

"detrimental to the best interests of racing" in <u>Perez</u>, it would be too high a burden to require

more specificity for certain particular areas subject to control by the Chief.  Limiting the

standards of conduct or appearance to specifics such as George Carlin's "seven words you can't

say on television" would be too restrictive in the context of prohibiting certain tattoos and is not

required by the due process vagueness test.

Finally, as noted above, the Second Circuit instructs that an "as-applied" vagueness

challenge must be considered in context.  In other words, the experience and knowledge in the

particular field of work or other activity subject to regulation must be part of the analysis.  Here,

it is important to consider that the plaintiffs are police officers who come into contact with

persons who have the spider web tattoo.  That likely raised some question as to the significance

and message of that tattoo.  Perhaps, as the plaintiffs maintain, they knew nothing of that

connotation; at least it should have raised a question in their minds that would result in their

contacting a superior officer.[17]

In sum, because of the context in which Section III.C.5 was applied to the plaintiffs, and

---

[16]For example, Section III.C.2 provides that "[a]ny hairstyle that presents an
unprofessional appearance as deemed by the Chief of Police shall be prohibited."  Similarly,
Section III.C.6(c) provides that, for detectives and other officers required to wear civilian
clothing, "[a]ny clothing that is . . . deemed inappropriate by the unit supervisor shall not be
allowed."

[17]Surely, plaintiffs Besse and Castagna had notice that some regarded the spider web
tattoo as offensive; they obtained their tattoos only one month before Chief Marquis' directive
and after Knight's letter and the Hartford city manager's letter to Chief Marquis indicating the
City Council's concern with the tattoos.

because the plaintiffs have been provided with actual notice that having spider web tattoos was prohibited conduct, their "as applied" vagueness challenge fails.

           2) Overbreadth Challenge

In the complaint, the plaintiffs also claimed that Section III.C.5 is "unconstitutionally overbroad for interfering with the rights of the plaintiffs . . . to express themselves freely, as guaranteed by the first amendment to the United States Constitution."  As noted previously in this ruling, the plaintiffs no longer allege that their freedom of expression was violated, and have withdrawn that portion of the complaint.  Consequently, the Court finds that the plaintiffs have withdrawn their overbreadth claim as well.

Because the Court has found that the defendants are entitled to summary judgment on all of the alleged constitutional violations, the defendants motion for summary judgment on count two is **GRANTED.**

**V**      <u>**Conclusion**</u>

The plaintiffs' motion for summary judgment **[Doc. # 19]** is **DENIED** and the defendants' motion for summary judgment **[Doc. # 18]** is **GRANTED** as to all counts.[18]

---

[18]Even if the plaintiffs had set forth a sufficient claim of a violation of their constitutional rights, the Court would have granted Chief Marquis summary judgment on the ground of qualified immunity because those rights were not "clearly established" at the time Chief Marquis issued his declaration. <u>See</u> <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001) (after a constitutional violation is shown, "the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition"); <u>see also</u> <u>Anderson v. Recore</u>, 317 F.3d 194, 197 (2d Cir.2003) ("clearly established" means that "(1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful")(quotation marks omitted).

The clerk is directed to close this case.

SO ORDERED this __30__ th day of March 2005, at Hartford, Connecticut.

___/s/ CFD_____

**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**